IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TORIBIO JIMENEZ MARTINEZ, MARIO LINEKAR SALGUERO, MIGUEL ANGEL JOVEL LOPEZ, TOMAS GUSMAN ARIAS PAUCAR, ENRIQUE ALEXANDER ORELLANA, VICTOR BECERRA, LORENZO COTRINA HUAMAN, JULIAN ARTURO MAGANA, JULIO ANTONIO SIBRIAN, LARRY COLLINS, RODNEY JOHNSON, JOHNNY LANCASTER, ROBERT MARTIN, JR., and RONNIE RONDELL, ) ) ) ) ) ) ) ) ) ) ) ) ) | |
|       Plaintiffs, ) | Civil Action No. _____ |
| ) | |
| vs. ) | |
| ) | JURY DEMAND |
| CUMBERLAND ENVIRONMENTAL RESOURCES COMPANY, ACCENT PERSONNEL SERVICES, INC., GARY LANG, LESBIA MARTINEZ, VIRGINIA PICKERING, and JOSE CAMPOBLANCO, ) ) ) ) ) ) ) | |
| ) | |
|       Defendants. ) | |

## COMPLAINT

### Preliminary Statement

1. This action is brought by two groups of plaintiffs: 1) temporary H-2B guest workers ("GUESTWORKERS") from Peru and El Salvador who were fraudulently recruited to the state of Tennessee by Defendants to perform jobs removing hazardous materials such as asbestos and lead; and 2) U.S. citizens ("U.S. WORKERS") who applied for and were illegally denied

work with Cumberland Environmental Resources Company ("Cumberland") as a result of their race, ethnicity, ancestry, national origin and/or alienage in violation of federal and state laws.

2. The GUESTWORKERS arrived indentured by debt and realities of the H-2B visa. They plunged their families into debt to pay for recruitment fees, visa expenses and travel costs – that equaled approximately two to four times the annual wages they earned in their home countries. They quit their jobs and left their homes and families to come to the United States based on false and fraudulent representations by Defendants. Contrary to the representations by Defendants and their agents, the GUESTWORKERS were not given the jobs they were promised, nor the rate of pay, amount of hours, housing, transportation, or duration of employment promised. Further, after the GUESTWORKERS arrived at Cumberland in Nashville, Cumberland required that they take and pay for classes in asbestos and lead removal. Cumberland then charged each worker an additional $2,500, telling them that was what it cost Cumberland to hire them. Once the GUESTWORKERS were finally given work removing hazardous materials (positions that none of the workers had been informed of or contracted to perform), Cumberland failed to pay them in compliance with federal law. When the GUESTWORKERS questioned Defendants Lang and Martinez about their pay and deductions, their employment was terminated. The GUESTWORKERS seek redress for violations of their rights under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 et seq., The Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and state law for the actions of Defendants who operated an illegal scheme to import a pool of easily exploitable foreign workers and then leased them for a profit.

3. The GUESTWORKERS were particularly vulnerable to exploitation because they were bound by debt, had few employment opportunities in their home countries, lacked

2

resources and knowledge of their rights once employed in the U.S., and knew that Cumberland, their sponsoring employer, had the power to control their livelihood as well as their immigration status. Defendants took full advantage of the GUESTWORKERS' vulnerability and caused the GUESTWORKERS to suffer a myriad of damages.

4. The U.S. WORKERS seek redress for violations of their rights under 18 U.S.C. § 1962 et seq., 42 U.S.C. § 1981, and state law for the actions of Defendants. The U.S. WORKERS applied for advertised job openings with Cumberland. Cumberland informed the U.S. Department of Labor ("DOL") that it did not hire any of the U.S. WORKERS. The reasons that Cumberland reported to the DOL for not hiring the U.S. WORKERS were false. The true reason the U.S. WORKERS were not hired was due to Cumberland's intent to discriminate against the U.S. WORKERS, thereby furthering Defendants' illegal scheme to import a pool of easily exploitable foreign workers.

## Parties

5. Plaintiffs Martinez, Salguero, Lopez, Orellana, Magana and Sibrian are citizens of El Salvador. Plaintiffs Paucar, Becerra and Huaman are citizens of Peru. Collectively, these Plaintiffs are herein referred to as the GUESTWORKERS.

6. Plaintiffs Collins, Johnson, Lancaster, Martin and Rondell are citizens of the United States. Collectively, these Plaintiffs are herein referred to as the U.S. WORKERS.

7. Defendant Cumberland is a Tennessee corporation with its principal address at 7106 Crossroads Blvd, Suite 204, Brentwood, Tennessee 37027. Its registered agent for service of process is Gary Lang.

8. Defendant Accent Personnel Services, Inc. ("Accent") is a Louisiana corporation with its principal address at 10988 N. Harrell's Ferry Road, Ste. 17, Baton Rouge, Louisiana

3

70816. Its registered agent for service of process is Virginia Pickering, 2012 Lac Cache Street, Baton Rouge, Louisiana 70816.

9. Defendant Gary Lang ("Lang") is a natural person who resides in the state of Tennessee. He is an owner and officer of Cumberland.

10. Defendant Lesbia Martinez ("Martinez") is a natural person who resides in the state of Tennessee. She is a supervisory employee of Cumberland.

11. Defendant Virginia Pickering ("Pickering") is a natural person who resides in the state of Louisiana. She is an owner and officer of Accent.

12. Defendant Jose Campoblanco ("Campoblanco") is a natural person who resides in the state of Louisiana. He is an employee of Accent.

## Jurisdiction and Venue

13. This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 as Plaintiffs' claims arise under 18 U.S.C. § 1962, 29 U.S.C. § 216(b) and 42 U.S.C. § 1981. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law claims because they are so related to the federal claims that they form part of the same case or controversy.

14. Venue is proper pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to this action occurred within this District and Defendants are either located, reside, or do business in this District.

## Facts

15. At all times material to this action, Defendant Cumberland provided hazardous material removal, construction, demolition and general labor services to other entities. It advertises itself on its website as providing a flexible labor force at reasonable prices.

4

16. Defendant Lang directs the operations of Cumberland. Defendant Martinez is also involved in the day-to-day operations and management of Cumberland's business, including the interviewing, hiring, training, assignments and payroll of employees, and the management of all aspects of Cumberland's H-2B workers, including their housing and transportation arrangements.

17. At all times material to this Complaint, Defendant Accent was a staffing company that, in part, specializes in helping its U.S. clients obtain foreign labor through work visa programs.

18. Defendant Pickering directs the operations of Accent. Defendant Campoblanco is also involved in Accent's operations and is responsible, in part, for recruiting H-2B workers, placing H-2B workers with Accent's customers and assisting Accent's customers and H-2B workers in obtaining visas.

19. Defendants have engaged in a scheme to fraudulently obtain permission from the U.S. government to utilize a pool of easily exploitable H-2B workers who could be used to meet the contractual needs of Accent's and Cumberland's clients.

20. The H-2B program enables employers to hire foreign workers to come to the U.S. to perform temporary nonagricultural labor if qualified U.S. workers are not available to perform such jobs.

21. Visas issued under the H-2B program are made out to both the sponsoring employer and the prospective foreign worker. The foreign worker is bound to the sponsoring employer and if the employer terminates the employment relationship, the worker loses his legal status to work or remain in the United States.

5

22. To obtain H-2B workers, an employer must submit an Application for Alien Employment Certification, Form ETA 750A ("Application") to the DOL.

23. Section 21 of the Application requires the employer to describe its efforts to recruit U.S. workers for the jobs and the results of such efforts.

24. Section 23 the Application includes a number of "Certifications" by the employer, including the following:

> b.  The wage offered equal[sic] or exceeds the prevailing wage and I guarantee that, if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work.
>
> ...
>
> e.  The job opportunity does not involve unlawful discrimination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.
>
> ...
>
> g.  The job opportunity's terms, conditions and occupational environment are not contrary to Federal, State or local law.
>
> h.  The job opportunity has been and is clearly open to any qualified U.S. worker.

25. Section 24 of the Application provides for the employer to declare, under penalty of perjury, that all of the information on the form is true and correct.

26. The DOL evaluates the Application and relies on the employer's representations in determining whether to approve the Application. If the DOL approves the Application, it issues a "labor certification" to certify the need for employment of aliens.

27. The employer then submits the labor certification to the Bureau of Citizenship and Immigrations Services ("CIS") along with a petition for a non-immigrant worker visa, Form I-

6

129. If the CIS approves the Form I-129, the employer then sends notice of the approval to the U.S. consulate office in the area from which the employer is recruiting prospective employees.

28. The process for obtaining H-2B workers is complicated and involves several different government agencies, as well as the recruitment of foreign workers and contact with the U.S. consulate in foreign countries. As a result, employers often work with companies who regularly assist in obtaining H-2B visas.

29. Cumberland utilized the services of Accent, a company engaged in the business of helping employers obtain U.S. government approval to employ H-2B workers, recruit H-2B workers and place them in jobs in the United States.

30. Accent acted as an agent for Cumberland.

31. In 2007 and 2008, Cumberland, with the assistance of Accent, prepared and submitted Applications for Alien Employment Certification to the DOL on Forms 750A for Hazardous Materials Removal Workers and Construction Laborers.

32. In an Application dated December 30, 2007, Lang certified that Cumberland had positions for 60 Hazardous Materials Removal Workers from April 1, 2008 through January 31, 2009, working 40 hours per week and varied overtime. **[Exhibit A]**. Lang originally offered $8.00 per hour for the position, but later increased the offer to $8.53 per hour, representing that that was the correct prevailing wage for the position.

33. In actuality, the prevailing wage for Hazardous Materials Removal Workers at the time of Cumberland's Application was $14.35 per hour. **[Exhibit B]**.

34. Lang also certified that Cumberland had undertaken various recruitment efforts to fill these positions with U.S. workers and that not a single U.S. worker had applied for the job. **[Exhibit C]**.

7

35. In an Application dated June 27, 2008, Lang certified that Cumberland had positions for 40 Construction Laborers from October 1, 2008 through July 31, 2009, working 40 hours per week and varied overtime. **[Exhibit D]**. Lang also certified that Cumberland had undertaken various recruitment efforts to fill these positions with U.S. workers. In the supporting documents submitted in connection with this Application, Lang represented that there were 16 applicants for the Construction Laborer jobs, but all were rejected. **[Exhibit E]**.

36. The reasons Cumberland gave for the failure to hire the U.S. applicants are false and a pretext for impermissible discriminatory motives.

37. The reason given for Plaintiff Lancaster is, "Interview declined, not able to work on October 1." This reason is false. Lancaster was unemployed at the time he applied to Cumberland and told them he could work at any time. He had construction experience and was qualified and available to perform any type of laborer position. Lancaster is Caucasian and a U.S. citizen.

38. The reason given for Plaintiff Martin is, "States needs work before October 1, not hired." This reason is false. Martin was also unemployed at the time he applied to Cumberland and also told them he could work at any time. Martin is Black and a U.S. citizen.

39. The reason given for Plaintiff Rondell is, "Contacted 8/12/08; moved out of the area, declined interview." This reason is false. Rondell was also unemployed at the time he applied to Cumberland. He initially interviewed with Martinez, who told him he was hired and to report to work on August 25, 2008. He showed up at Cumberland on that date to work, at which time Martinez told him they had hired someone with better qualifications and that they would not be employing him. At no time relevant to this Complaint did Rondell move or change addresses, nor did he tell anyone that. Rondell is Caucasian and a U.S. Citizen.

8

40. The reason given for Plaintiff Collins is, "Offered interview, Applicant did not attend." This reason is false. Collins applied to Cumberland through an online application and never received a response at any time. He received no email or phone messages from Cumberland offering him an interview. Collins is Black and a U.S. citizen.

41. The reason given for Plaintiff Johnson is, "Scheduled for Interview. Applicant was a no-show." This reason is false. Johnson applied to Cumberland in August 2008 in response to an advertisement for the construction labor position. Cumberland never contacted him for an interview. Johnson continued to contact Cumberland and eventually, in November 2008, Martinez told him that if he took their training class on asbestos and lead removal they might have some work for him. He completed the training class and eventually worked a few jobs for Cumberland doing asbestos removal. Upon information and belief, when Johnson performed work for Cumberland, he was paid a higher wage than H-2B workers who performed the same job. Johnson is Black and a U.S. citizen.

42. Upon information and belief, the other 11 applicants are also U.S. Citizens and the reasons given by Cumberland for not hiring them are false.

43. Defendants submitted the Applications to the DOL through the U.S. mail, by common interstate carrier, and/or through wire transmissions.

44. Several of the representations in Cumberland's Applications were fraudulent. Among other things, Cumberland falsely represented: (1) that the jobs described therein actually existed; (2) that the amount of work promised was available; (3) that the job qualifications were as described in the Application; (4) that the wage rates were accurately described as the correct prevailing wage; (5) that the jobs would be for the full term of the visa; (6) that the jobs were open to U.S. workers; (7) that U.S. workers were not available for the

9

jobs; (8) that the job opportunity did not involve illegal discrimination; and (9) that the terms and conditions of the job offering did not violate federal or state law.

45. On information and belief, Cumberland did not have firm contractual commitments for the jobs described in the Applications and Cumberland's clients retained the right to change the number and qualifications of workers needed at will.

46. Defendants knew or should have known that the statements in the Applications submitted to the DOL were fraudulent.

47. Cumberland's communications with Accent regarding the preparation and filing of the Applications and supporting materials were carried out by telephone, fax, U.S. mail and/or common interstate carrier.

48. Defendants' communications with state and federal agencies regarding the Applications and recruitment were carried out by telephone, fax, U.S. mail and/or common interstate carrier.

49. Relying upon the fraudulent representations in Defendants Applications, the DOL granted Cumberland's labor certification for employment of H-2B workers. Those certifications were communicated by U.S. mail to Cumberland's agent, Accent.

50. After receiving the certification from the DOL, Defendants prepared and delivered Form I-129 petitions to CIS by U.S. mail or common interstate carrier. On information and belief, those petitions contained the same fraudulent representations as were contained in the Applications.

51. On information and belief, CIS approved Defendants' Form I-129 petitions based on fraudulent representations in the petitions and the labor certifications fraudulently obtained from the DOL.

10

52. On information and belief, the expertise provided by Accent was critical to Cumberland's success in obtaining DOL and INS approval of H-2B visas.

53. Accent engaged the services of additional agents to contact and recruit workers outside of the United States.

54. One agent was a company called Trabajadores Industriales Salvadoreños ("TIS") in El Salvador. Upon information and belief, TIS has been shut down due to fraudulent practices.

55. Another agent was a company called Interjobs in Peru.

56. Defendants, acting directly and through their agents, recruited the GUESTWORKERS to accept employment by presenting them with job offers that contained numerous false representations.

57. Specifically, in 2007 and 2008, TIS, an agent of Cumberland and Accent, offered jobs to Plaintiffs Martinez, Salguero, Lopez, Magana and Sibrian to work for a company called Jani-Care, located in Baton Rouge, Louisiana, performing janitorial and cleaning services for residential and commercial buildings. These Plaintiffs were promised that they would be paid $9.50 per hour, that they would have steady work of at least 40 hours per week, that the work would last for a set amount of time (six months or more, with opportunities for extensions), and that their housing and transportations costs would be paid by the employer once they arrived in the United States.

58. In reliance upon these promises, Plaintiffs Martinez, Salguero, Lopez, Magana and Sibrian accepted the job offers. They signed employment contracts reflecting, or that they were told reflected, that they would work based on the terms and conditions described above.

59. In further reliance upon the promises of Defendants' agents, these Plaintiffs went into debt to pay the required fees, quit their jobs, and left their homes and families. The

11

required fees were for recruitment fees, visa expenses and travel costs. These Plaintiffs borrowed heavily to pay the fees of $3,500-$4,000 each, which represented two to four years worth of wages that these Plaintiffs earned in El Salvador. For example, Plaintiff Martinez, who earned $140 per month in El Salvador working as a security guard, paid TIS $3,500 to accept the job; Plaintiff Lopez earned $100 per month as a farmworker and plumber and was required to pay $4,000.

60. After receiving their visas, Plaintiffs Martinez, Salguero, Lopez, Magana and Sibrian went to the airport where a TIS employee provided them their airline tickets and required them to sign a paper that he did not let them read or copy. The airline tickets showed a destination of Nashville rather than Baton Rouge. These Plaintiffs were told that someone would pick them up at the airport in Nashville.

61. It was not until Plaintiffs Martinez, Salguero, Lopez, Magana and Sibrian arrived in Nashville and were met at the airport by Martinez that they learned they would be working for Cumberland rather than Jani-Care. She informed them that they would be performing asbestos removal after they took a training class, and that they would be paid for their time spent in training. She also told them that Cumberland would charge them an additional $2,500 each to recover the company's cost in hiring them, but that they should not worry because there was enough work that they would make a lot of money. She then took Plaintiffs to an apartment in Madison, Tennessee which was shared by 6-7 workers, almost all of whom slept on the floor because Cumberland provided no beds.

62. Contrary to the promises made to these Plaintiffs in El Salvador and by Martinez in the United States, Plaintiffs were not paid for the time they spent in the training class but rather were charged $350 for the course; they were also required to pay $200 per month for their

12

housing, no transportation was provided, and they were provided very sporadic amounts of work. When Plaintiffs did work, Cumberland deducted money from their paychecks for the $2,500 fee, the cost of visa extensions, license fees, tools and equipment.

63. Plaintiff Orellana was also recruited by TIS in El Salvador to work for Jani-Care in Baton Rouge and he accepted employment in reliance on the same representations made to the Plaintiffs described above. He began work at Jani-Care in late 2007. Jani-Care did not provide the promised number of hours, the promised hourly rate, or free lodging and transportation. Moreover, Jani-Care was not paying the required prevailing wages and benefits. When Orellana complained to Jani-Care about its failure to honor its promises and obligations, he was told to go back to El Salvador if he did not like it. In April 2008, Orellana called Campoblanco, who promised Orellana a better job with better pay and working conditions at Cumberland in Nashville. Campoblanco referred Orellana to Martinez who offered Orellana a job with Cumberland paying $12 per hour doing general construction. She promised that he could begin work immediately, that he would have at least 40 hours of work per week and that he would receive free transportation and housing.

64. In reliance on Martinez's representations, Orellana accepted a job with Cumberland in April 2008. Orellana traveled by bus to Nashville. Once in Nashville, Martinez did not let him begin work immediately; rather she told him that he could not work until he completed the asbestos removal training class. She also told Orellana that Cumberland would charge him $2,500 to recover the company's cost in hiring him. He was placed in an apartment in Madison, Tennessee with other guestworkers and had to pay $200 per month in rent. Cumberland provided no beds, so he slept on the floor. Despite being told he would be paid to attend the training class, he found out he was charged for it. Cumberland did not reimburse him for his

13

travel expenses, it did not provide free housing or transportation, nor did it pay Orellana the wages he was promised. After completing the training, Orellana was provided very sporadic amounts of work. When he did work, Cumberland deducted money from his paycheck for the $2,500 fee, the cost of visa extensions, license fees, tools and equipment, as well as transportation costs.

65. Plaintiffs Becerra and Huaman were recruited by Interjobs, an agent of Cumberland and Accent, in Peru. Interjobs offered Becerra and Huaman jobs performing janitorial services for a company in Denver, Colorado. These Plaintiffs were promised that they would be paid $9.50 per hour, that they would have steady work of at least 40 hours per week, that the work would last for a set amount of time, and that their housing and transportations costs would be paid by the employer once they arrived in the United States. In reliance upon Interjobs' representations, Becerra and Huaman went into debt to pay the required recruitment and visa fees as well as travel costs, quit their jobs, and left their homes and families. Once in Colorado, the employer did not provide the promised amount of work or rate of pay. Becerra and Huaman spoke with Campoblanco in April 2008. Campoblanco promised them that he could transfer their visas to Cumberland where they could do demolition work for $9.50 per hour. In reliance upon Campoblanco's promises, Becerra and Huaman accepted the jobs and travelled to Nashville. They paid Campoblanco $900-$1,000 each for the visa transfer.

66. Becerra and Huaman met with Martinez in Nashville. She told them that before they could start work, they had to take a training class. She also told them that they had to pay an additional $2,500 each to recover the costs Cumberland paid to hire them. Becerra and Huaman completed the class, but like the other GUESTWORKERS, were not put to work right away. When Plaintiffs did work, the work was sporadic and Cumberland deducted money

14

from their paychecks for the $2,500 fee, the cost of visa extensions, license fees, tools and equipment.

67. Plaintiff Paucar was also recruited by Interjobs in Peru. Paucar worked in construction in Peru making the equivalent of $12 per day. Interjobs promised him a job with Cumberland doing general labor and construction work at $9.50 per hour, for at least 40 hours per week and free housing and transportation. In reliance on these promises, Paucar accepted the job with Cumberland, went into debt to pay Interjobs $2,500, and bought an airline ticket for $1,200. Although he received his visa in August 2008, which was only valid for six months, Defendants delayed his travel for over two months. Finally Paucar was told that he could travel to Nashville, and he arrived on October 21, 2008. When he arrived in Nashville, a Cumberland employee took him to an apartment in Madison and told him that he had arrived too early and he could not start until November 1. On November 1, Paucar went to Cumberland and met with Martinez who told him that he would be doing asbestos removal. When Paucar said that he was told the job was general labor and construction, Martinez told him that if he wanted to work, he had to take a training course on asbestos removal. She also told him they would charge him $2,500 for the cost to hire him. Paucar completed the course, but received very little work. When he did work, the work was sporadic and Cumberland deducted money from his paychecks for the $2,500 fee and license fees.

68. On information and belief, communications between Defendants and their agents were conducted by wire, U.S. mail, common interstate carrier and fax.

69. In all cases, the GUESTWORKERS accepted employment, borrowed money, paid fees, quit their jobs and left their homes in reliance upon fraudulent statements made by Defendants and their agents.

15

70. In reliance upon the fraudulent terms and conditions of employment offered by Defendants, the GUESTWORKERS incurred thousands of dollars of debt due to recruitment fees, visa fees and point-of-hire travel costs they paid in their home countries, the $2,500 charged by Cumberland once they began employment, and excessive fees for visa renewals and/or transfers.

71. All of the costs described in paragraph 70 were "primarily for the benefit and convenience" of the employer, as that phrase is used in 29 C.F.R. §531.3(d)(1) and caused the first week's wages of the GUESTWORKERS to fall below minimum wage, as well as subsequent weeks in which deductions were taken.

72. Upon arrival in the United States, the GUESTWORKERS were not employed as represented on the employment contracts they signed or as they were represented to the GUESTWORKERS, nor as represented in their visa applications. Instead, they were re-routed to Cumberland in Nashville as opposed to Jani-Care, or were transferred to Cumberland based on false representations. Once at Cumberland, the GUESTWORKERS were told they would be performing asbestos and lead removal work, rather than the general labor or janitorial jobs they had been promised. Even then, they could not start working and earning money right away, but were required to pay for, attend and complete asbestos and lead removal training provided by Cumberland.

73. After completing the asbestos and lead removal training, many of the GUESTWORKERS were not given work until several weeks later. Throughout their employment with Cumberland, the GUESTWORKERS often were given no work. When they were given work, they performed jobs that were different from the jobs that they had contracted to perform and they were not paid at the correct prevailing wage.

16

74. Despite the GUESTWORKERS often waiting weeks at a time for work, Cumberland obtained visa renewals for many of them, some even on two occasions.

75. When the GUESTWORKERS complained about the paycheck deductions and the lack of work, Defendants discharged them prior to the end of the term of work offered to them.

76. Defendants did not fully reimburse the amount of money required to pay for the cost of transportation back to the respective GUESTWORKERS' home country.

### Count I - RICO
### Brought by All Plaintiffs against All Defendants

77. Plaintiffs restate and incorporate herein the allegations in paragraphs 1 through 76 above.

78. At all times material to this action, each of the Defendants is a "person" as defined by RICO, 18 U.S.C. § 1961(3).

79. The Defendants and their agents, separately and together, form "enterprises" as defined by RICO, 18 U.S.C. § 1961(4).

80. The legitimate purpose of the enterprise(s) was to provide labor to client companies.

81. The enterprise(s) were engaged in, or their activities affected, interstate and foreign commerce. Among other things, the enterprise(s) contracted to provide laborers, including the GUESTWORKERS, for companies located in different states.

82. At all times material to this action, Defendants Lang, Martinez, Pickering and Campoblanco were all employed by or associated with Cumberland or Accent and, with specific intent to profit, operated or managed the enterprise(s) through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c).

83. In order to perpetrate their criminal worker exploitation scheme, Defendants knowingly and willfully committed predicate racketeering offenses under RICO 18 U.S.C. §

17

1961(a)(B) including mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and fraud in obtaining and using visas in violation of 18 U.S.C. § 1546.

84. As part of its criminal worker exploitation scheme, Defendants knowingly and willfully devised a scheme to defraud the DOL and CIS for the purpose of depriving the GUESTWORKERS of the wages and benefits required by federal law and the DOL labor certifications, and deprive them of other federally protected rights.

85. As part of its criminal worker exploitation scheme, Defendants knowingly and willfully devised a scheme to defraud the DOL and CIS for the purpose of depriving the U.S. WORKERS of their right to enter into contracts in violation of their federal civil rights.

86. Defendants knowingly used the mails, telephone, common interstate carriers and/or fax to communicate with their agents, state employment service offices, the DOL, CIS, and U.S. consulates in foreign countries with the specific intent of executing and furthering this fraudulent scheme in violation of 18 U.S.C. § 1341 and 1343.

87. Upon information and belief, the DOL and CIS justifiably relied on the fraudulent Applications, labor certifications and I-129 petitions in approving through U.S. mail Defendants' Application to employ H-2B workers.

88. Defendants knowingly made false statements of material fact under penalty of perjury in visa applications and other documents required by the immigration laws and knowingly presented such applications and documents in violation of 18 U.S.C. § 1546(a).

89. Defendants knowingly obtained and made use of H-2B visas knowing them to have been procured by means of the false statements and fraud in violation of 18 U.S.C. § 1546(a).

90. The predicate acts of criminal racketeering activity described above constitute a "pattern of racketeering activity" as defined by RICO, 18 U.S.C. §1961(5). Defendants

18

repeatedly committed the predicate acts of visa fraud, making numerous fraudulent representations in their visa applications involving numerous visas over at least a two-year period. In addition, Defendants repeatedly engaged in acts of mail and wire fraud to further their fraud upon the U.S. government and the Plaintiffs in this action.

91. The predicate acts of criminal racketeering activity were related in at least the following ways: (1) they had common participants; (2) they had the same victims, i.e. the GUESTWORKERS, the U.S. WORKERS, and the U.S. government; (3) they had the same purpose of creating a pool of exploitable workers for the benefit of Defendants and at the expense of the GUESTWORKERS and the U.S. WORKERS, as well as similarly situated U.S. Workers; and (4) they were interrelated in that without the acts of mail fraud, wire fraud, and visa fraud, Defendants would not have been able to exploit Plaintiffs and deprive them of their lawful property, visa and contract rights.

92. The acts of racketeering activity have been part of Defendants' regular way of business and imply a threat of continued criminal activity.

93. As a direct, intended and foreseeable result of the Defendants' violations of RICO, the GUESTWORKERS have suffered injury to their property, including fraudulent, excessive and double charges for employment placement and visa services and visa fees, as well as the right to be paid contractual and lawful wages for their work.

94. As a direct, intended and foreseeable result of the Defendants' violations of RICO, the U.S. Workers have suffered injury, including lost wages and the denial of their civil rights to contract.

95. The criminal acts of mail, wire and visa fraud committed by Defendants were directly related to and were substantial factors in causing injury to Plaintiffs.

96. Plaintiffs are entitled to relief including their actual damages, treble damages, attorneys fees' pursuant to18 U.S.C. §1962(c) and costs.

**Count II - FLSA**
**Brought by Guestworkers against Defendants Cumberland, Lang and Martinez**

97. Plaintiffs restate and incorporate herein the allegations in paragraphs 1 through 96 above.

98. Defendants Cumberland, Lang and Martinez are all an "employer" within the meaning of 29 U.S.C. § 203(d).

99. At all times material to this action, Lang and Martinez were owners, corporate officers, managers or supervisors of Cumberland and controlled directly or indirectly the management of Cumberland including the management of Cumberland's employees, payroll practices and records, terms and conditions of employment and working conditions.

100. At all time material to this action, Cumberland was an enterprise engaged in commerce as defined by 29 U.S.C. § 203(r)(1), with an annual dollar business volume exceeding $500,000.

101. At all times material to this action, the H-2B WORKERS were all "employees" of Cumberland, Lang and Martinez as defined by 29 U.S.C. § 203(e)(1).

102. At all times material to this action, Cumberland failed to accurately record all hours worked by the GUESTWORKERS.

103. The minimum wage and overtime provisions set forth in 29 U.S.C. §206 and 207, respectively, of the FLSA apply to Cumberland, and the GUESTWORKERS were covered by 29 U.S.C. § 206 and 207 of the FLSA while they were employed on an hourly basis by Cumberland.

104. Each of the GUESTWORKERS worked hours while employed by Cumberland for which they either received no compensation, for which they were improperly paid at rates less than one-and-one half times their regular rate, and/or for which they were paid below the minimum wage and/or the applicable prevailing wage. Specifically, the GUESTWORKERS were required, suffered or permitted to work hours off-the-clock, including, without limitation, time spent in training courses and time spent traveling to and from job sites after the beginning of the work day and before the end of the work day, which is compensable time pursuant to the continuous workday rule. In addition, Cumberland made numerous improper deductions and *de facto* deductions from the GUESTWORKERS' pay, including without limitation, deductions for lodging, travel, transportation, licenses and tools of the trade.

105. Cumberland did not take into account the fees paid by the H-2B workers in their home countries or the further deductions or *de facto* deductions that Cumberland took from the GUESTWORKERS' paychecks in determining whether they paid the wages required by the FLSA.

106. The deductions and *de facto* deductions taken by Cumberland and/or the off-the-clock work, caused the GUESTWORKERS to earn less than the wages required by the FLSA, including the statutory minimum wage and required overtime premium.

107. At all times material to this action, Cumberland was required to pay the GUESTWORKERS at least the prevailing wage for their positions, which was $14.35 per hour.

108. The prevailing wage constitutes the "regular rate" for the GUESTWORKERS for purposes of calculating their overtime premium rate of pay for any hours over 40 that they worked in a work week pursuant to *Sobczak v. AWL Industries, Inc.*, 540 F.Supp.2d 354 (E.D. N.Y. 2007).

109. The violations by Defendants Cumberland, Lang and Martinez were willful.

110. As a result, the GUESTWORKERS are entitled to the full amount of unpaid wages they are owed, an additional amount in liquidated damages pursuant to 29 U.S.C. § 216(b) and/or prejudgment interest, an award of attorneys' fees pursuant to 29 U.S.C. § 216(b) and the costs associated with this action.

## Count III - Breach of Contract
### Brought by Guestworkers against Cumberland and Accent

111. Plaintiffs restate and incorporate herein the allegations in paragraphs 1 through 110 above.

112. The H-2B Workers entered into valid and binding contracts by accepting the offers of employment on the terms presented to them.

113. In addition, the terms represented on the Applications submitted to the DOL, including the requirement to pay the correct prevailing wages and/or benefits, constitute contractually binding terms of employment between Defendants and the GUESTWORKERS.

114. Further, the GUESTWORKERS are intended third-party beneficiaries of any and all contracts under which they performed work that were governed by the Davis-Bacon Act and any other federal or state prevailing wage laws.

115. Defendants Cumberland and Accent breached these contracts by, among other things, failing to provide work of the nature promised, failing to pay the rate of pay promised, failing to pay the correct prevailing wages and/or benefits (including overtime at the correct prevailing wage overtime premium), failing to provide the hours of work promised, failing to provide work for the full duration promised, and failing to pay the full amount of wages promised by making extra-contractual deductions from pay.

Case 3:09-cv-00730 Document 1 Filed 08/07/09 Page 22 of 31 PageID #: 22

116.    The GUESTWORKERS suffered damages due to Cumberland's and Accent's breach.

117.    As a result, the GUESTWORKERS are entitled to recover all of their damages flowing from the breach, including the difference between the wages they made and would have made had they received the work, rate of pay, benefits and full amount of wages promised, the costs they advanced, the money they paid to Cumberland's and Accent's agents, the $2,500 they paid to Cumberland, the costs for housing and transportation that they paid, and other consequential damages, costs, interest, and any other legal and equitable relief to which they may be entitled.

## Count IV - Tennessee Consumer Protection Act
## Brought by Guestworkers against all Defendants

118.    Plaintiffs restate and incorporate herein the allegations in paragraphs 1 through 117 above.

119.    The Defendants are each a "person" within the meaning of T.C.A. § 47-18-103(9).

120.    The GUESTWORKERS, for purposes of their acquiring goods, services, property or anything of value (job placement services, visa assistance services, visas, visa transfers and visa renewals) are each a "consumer" within the meaning of T.C.A. § 47-18-103(2).

121.    Before traveling to the United States, the GUESTWORKERS paid agents of Cumberland and Accent for jobs placement and visa assistance services. In reliance on representations by Defendants' agents that they would be employed to do janitorial work for Jani-Care, working at least 40 hours per week for a set duration of time, Plaintiffs Martinez, Salguero, Lopez, Magana and Sibrian paid recruitment fees, visa expenses and travel costs. Based on information and belief, these Plaintiffs paid amounts well over any reasonable charge

for the services and products they received. These Plaintiffs did not receive the jobs, the employer, or the terms and conditions of employment represented to them by Defendants' agents and instead were required to perform asbestos removal for Cumberland. They did not get the amount of hours of work promised, nor were they allowed to work for the duration of time promised. Once in the United States, Cumberland also charged these Plaintiffs an additional $2,500 each for their placement and visa expenses, and also charged them for visa renewals.

122. Plaintiffs Paucar, Orellana, Becerra and Huaman also paid agents of Cumberland and Accent for jobs placement and visa assistance services. In reliance on representations by Defendants' agents that they would be employed for at least 40 hours per week doing work of a specific nature, at a specified rate of pay and for a specified duration (with an opportunity for extensions), these Plaintiffs paid recruitment fees and visa expenses. Based on information and belief, these Plaintiffs paid amounts well over any reasonable charge for the services and products they received. These Plaintiffs did not receive the jobs or the terms and conditions of employment represented to them. As a result, Plaintiffs Orellana, Becerra and Huaman, relying on representations made by Campoblanco and Martinez, accepted jobs with Cumberland. Becerra and Huaman paid visa transfer fees to Campoblanco. Based on information and belief, the visa transfer fees were well over the reasonable charge for such services. Once at Cumberland, Paucar, Orellana, Becerra and Huaman did not do general labor or construction jobs as they had been promised but instead were required to perform asbestos removal. They did not get the amount of hours of work promised, nor were they allowed to work for the duration of time promised. Once in the United States, Cumberland also charged these Plaintiffs

24

an additional $2,500 each for their placement and visa expenses, and also charged them for visa renewals.

123. The actions of the Defendants and their agents in charging the GUESTWORKERS for job placement and visa assistance services and then failing to provide the services and goods in accordance with the terms of the offer, for overcharging and/or double charging for such goods and services, and for charging over and above the reasonable cost of such goods and services are unfair and/or deceptive acts or practices in violation of the Tennessee Consumer Protection Act, T.C.A. § 47-18-101 et seq. Specifically, Defendants have engaged in unfair and/or deceptive acts or practices including, but not limited to, T.C.A. § 47-18-104(b)(1), (2), (5), (9), (12), (21), and (27).

124. The GUESTWORKERS suffered a loss of money, property or thing of value as a result of the unfair and/or deceptive acts or practices of Defendants.

125. The Defendants' actions were willful or knowing violations and the GUESTWORKERS are entitled to rescind their contracts and/or receive their actual damages, treble damages, and attorneys' fees pursuant to T.C.A. § 47-18-109(a)(3) and (e)(1).

### Count V - Fraud in the Inducement
### Brought by Guestworkers against All Defendants

126. Plaintiffs restate and incorporate herein the allegations in paragraphs 1 through 125 above.

127. As described above, Defendants and their agents made promises to the GUESTWORKERS as to material matters, including promising work of a particular nature, at certain wages and of a certain amount and duration, and regarding other terms and conditions of the offered positions.

25

128. Defendants and their agents made such promises with the intention of inducing the GUESTWORKERS to rely upon and act on such promises.

129. At the time as Defendants and their agents made such promises, Defendants did not intend to perform as promised.

130. The GUESTWORKERS were unaware of Defendants' true intentions and reasonably relied on their promises. In relying on Defendants' promises, the GUESTWORKERS quit their jobs in their home countries, left their homes and families, incurred substantial costs, including recruitment fees, visa or visa renewal fees, travel costs and related expenses to accept employment. In addition, Cumberland required the GUESTWORKERS to pay for many of these costs again once they arrived in Nashville.

131. As a result of their reliance, the GUESTWORKERS have suffered damage.

132. As a result, the GUESTWORKERS are entitled to recover damages, including consequential damages, punitive costs, interest, and any other legal and equitable relief to which they may be entitled.

## Count VI - TCA Section 50-1-102
## Brought by Guestworkers against All Defendants

133. Plaintiffs restate and incorporate herein the allegations in paragraphs 1 through 132 above.

134. Defendants violated T.C.A. § 50-1-102 by bringing the GUESTWORKERS into the state of Tennessee through or by means of false or deceptive representations, false advertising or false pretenses concerning the kind of character of the work to be done, or the amount and character of compensation to be paid for the work.

26

135. As a result, the GUESTWORKERS have been damaged and are entitled to recover their damages, an award of attorneys' fees pursuant to T.C.A. § 50-1-102(c)(2), costs, interest, and any other legal and equitable relief to which they may be entitled.

### Count VII - Wrongful Termination/Retaliation
### Brought by Guestworkers against Cumberland and Lang

136. Plaintiffs restate and incorporate herein the allegations in paragraphs 1 through 135 above.

137. It is the public policy and law of the State of Tennessee that employees must be able to exercise their rights under state and federal law without fear of reprisal or penalty from an employer.

138. Contrary to the public policy and common law of the State of Tennessee, as well as in violation of the Tennessee Public Protection Act, T.C.A. § 50-1-304, Cumberland terminated the GUESTWORKERS' employment relationship in retaliation for their exercise of rights under the FLSA and state wage regulations.

139. Specifically, beginning in January 2009, the GUESTWORKERS complained to Lang and Martinez that they were not receiving the amount of work they had been promised and yet Cumberland was taking deductions from their checks and wanted to take further deductions for visa renewals. The GUESTWORKERS collectively wrote a letter to Lang on February 10, 2009 requesting a meeting where they could discuss their concerns. Lang did not meet with the GUESTWORKERS. Instead, he sent each of them a letter dated February 13, 2009 terminating their employment.

140. The termination of the GUESTWORKERS was in direct retaliation for their exercise of their rights to oppose illegal activity and enforce their rights under the FLSA and state wage laws. These wrongful retaliatory actions by Cumberland and Lang were intended to

27

and in fact had the effect of stifling the GUESTWORKERS from exercising their protected rights.

141. As a result, the GUESTWORKERS have been damaged and are entitled to recover their damages, including lost wages, emotional distress, consequential damages, punitive damages, attorneys' fees, costs, interest, and any other legal and equitable relief to which they may be entitled.

## Count VIII - Section 1981
### Brought by U.S. Workers against Defendants Cumberland, Lang and Martinez

142. Plaintiffs restate and incorporate herein the allegations in paragraphs 1 through 141 above.

143. Plaintiffs Collins, Johnson, Lancaster, Martin and Rondell are Caucasian and Black U.S. citizens.

144. Plaintiffs Collins, Johnson, Lancaster, Martin and Rondell applied for and were denied jobs with Cumberland in August 2008.

145. Cumberland refused to enter into employment contracts with Plaintiffs Collins, Johnson, Lancaster, Martin and Rondell because of their race (Caucasian and Black), ancestry and ethnicity (American and Non-Hispanic), and/or alienage (U.S. Citizens).

146. These actions by Cumberland, Lang and Martinez constitute intentional discrimination in violation of 42 U.S.C. § 1981.

147. As a result, the U.S. Workers have been damaged and are entitled to recover their damages, including lost wages, attorneys' fees, costs, interest, and any other legal and equitable relief to which they may be entitled.

## Count IX - THRA
### Brought by U.S. Workers against Cumberland, Lang and Martinez

28

148. Plaintiffs restate and incorporate herein the allegations of paragraphs 1 through 147 above.

149. Cumberland is an employer as defined in the Tennessee Human Rights Act, T.C.A. § 4-21-101 et seq. ("THRA").

150. Lang and Martinez engaged in, aided, abetted, incited, compelled and/or commanded persons to engage in discriminatory practices in violation of T.C.A. § 4-21-301.

151. The U.S. Workers applied for positions as construction laborers that were advertised by Cumberland in August 2008. The U.S. Workers were qualified for the jobs advertised. Cumberland, Lang and Martinez did not hire the U.S. Workers for these positions, but informed the DOL that they needed H-2B workers to fill them. Lang certified to the DOL reasons why it did not hire the U.S. Workers, but those reasons were false.

152. The decision by Cumberland, Lang and Martinez not to hire the U.S. Workers for construction laborer positions in August 2008 was discriminatory on the basis of the U.S. Workers' race, ancestry and ethnicity, national origin and/or alienage in violation of the THRA.

153. Collins, Lancaster, Martin and Rondell were never hired by Cumberland at any time. Johnson, after repeatedly contacting Cumberland, was told by Martinez in November 2008 that if he paid for and completed a training class on asbestos and lead removal, she might have some work for him to do. Johnson paid for and completed the training and did perform some work for Cumberland, although it was never construction labor, the position advertised by Cumberland in August 2008.

154. The U.S. Workers suffered monetary damages and mental anguish and humiliation as a result of Cumberland's, Lang's and Martinez's discriminatory practices.

155.  As a result, the U.S. Workers are entitled to recover their damages, including lost wages, compensatory and punitive damages, attorneys' fees, costs, interest, and any other legal and equitable relief to which they may be entitled.

**WHEREFORE**, Plaintiffs respectfully pray that the Court:

1.  That a trial by jury be had on all triable issues;

2.  Enter judgment in favor of all Plaintiffs and against Defendants on all counts in this action;

3.  Enter declaratory judgment declaring that Defendants have violated the laws set forth in this Complaint;

4.  Award all Plaintiffs actual damages, in an amount to be proven at trial, and treble damages, as well as attorneys' fees and costs pursuant to 18U.S.C. § 1962(c);

5.  Award GUESTWORKER Plaintiffs actual damages, in an amount to be proven at trial, and liquidated damages, as well as attorneys' fees and costs pursuant to 29 U.S.C. § 216(b);

6.  Award GUESTWORKER Plaintiffs rescission and/or actual damages, in an amount to be proven at trial, and treble damages, as well as attorneys' fees and costs pursuant to T.C.A. § 47-18-109;

7.  Award GUESTWORKER Plaintiffs actual damages, in an amount to be proven at trial, as well as attorneys' fees and costs pursuant to T.C.A. § 50-1-102 (c)(2);

8.  Award GUESTWORKER Plaintiffs compensatory, and punitive damages, including lost wages, lost employment benefits, emotional distress, front pay, back pay, and attorneys' fees for retaliation and wrongful termination;

Case 3:09-cv-00730   Document 1   Filed 08/07/09   Page 30 of 31 PageID #: 30

9. Award U.S. WORKER Plaintiffs compensatory, and punitive damages, including lost wages, lost employment benefits, emotional distress, front pay and attorneys' fees for violations of 42 U.S.C. § 1981 and the THRA;

10. Award all Plaintiffs punitive damages;

11. Award all Plaintiffs reasonable attorneys' fees, costs, and expenses;

12. Award all Plaintiffs pre-judgment and post-judgment interest from Defendants;

13. Provide for such other and further relief to which the Plaintiffs may be entitled.

Respectfully submitted,

*Charles Yezbak /with permission cjc*

**CHARLES P. YEZBAK, III (#18965)**
Attorney for Plaintiff
2002 Richard Jones Road, Suite B-200
Nashville, Tennessee 37215
(615) 250-2000
(615) 250-2020 Facsimile
yezbak@yezbaklaw.com

*Cynthia Cutler*

**CYNTHIA J. CUTLER (#22062)**
Attorney for Plaintiff
2002 Richard Jones Road, Suite B-200
Nashville, Tennessee 37215
(615) 242-0005
ccutler@ccutlerlaw.com

31